IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

Cassiopia Rhoads,

                Plaintiff,

v.

Southern Health Partners; Robert J. Williams,
M.D.; Brandi Galloway; Donna Wright;
Chanate Buchanan; Tonetta Buggs; Tamara
Erikson; Erik Riddell; Jessica Whitaker,

                Defendants.

C/A No.: 8:22-cv-1409-SAL

**ORDER**

In May and June 2019, Plaintiff Cassiopia Rhoads was held at the Aiken County Detention Center ("ACDC") for approximately thirty days. During that time, an abscess on the side of her head grew, causing her pain, dizziness, nausea, vomiting, and other symptoms. She was seen by medical staff many times while at ACDC, but she was not taken to the hospital until June 2, 2019. At the hospital, Plaintiff was diagnosed with "Osteomyelitis with subgaleal and epidural abscesses" and severe sepsis, and she underwent "a right parietal craniectomy." [ECF No. 1 at 9.]

In May 2022, Plaintiff filed this action under 42 U.S.C. § 1983, alleging that Defendants— including five correctional officers ("ACDC Defendants"), three members of the medical staff at ACDC, and the company the medical staff worked for (medical staff and the company, collectively, "SHP Defendants")—violated her rights under the Eighth and Fourteenth Amendments to the United States Constitution. This case was referred to United States Magistrate Judge Bristow Marchant for preliminary matters, and he recommends that all of the Defendants be dismissed from this action. Plaintiff only objects to this recommendation as to two of the ACDC Defendants—Lieutenant Erik Riddell and Lieutenant Jessica Whitaker. Based on Plaintiff's

1

position, this order focuses on the claims against those two Defendants. But, ultimately, the court concludes that summary judgment should be granted as to all of the ACDC Defendants, and the SHP Defendants should be dismissed, as well.

## PROCEDURAL HISTORY

Plaintiff filed this action in May 2022. [ECF No. 1.] On September 1, 2023, the ACDC Defendants—Chanate Buchanan, Tonetta Buggs, Tamara Erikson, Erik Riddell, and Jessica Whitaker—moved for summary judgment as to all claims against them. [ECF No. 81.] On September 14, 2023, Plaintiff filed her opposition. [ECF No. 84.] And, on September 21, 2023, the ACDC Defendants replied. [ECF No. 85.]

On September 14, 2023, the SHP Defendants filed a motion to dismiss the claims against them with Plaintiff's consent. [ECF No. 83.] Shortly after, the ACDC Defendants filed their opposition to that motion, ECF No. 87, and a few days later the SHP Defendants replied, ECF No. 88.

On November 10, 2023, Plaintiff filed a notice of intent to supplement, in which she advised the court she intended to supplement both the record and her opposition to the pending motion for summary judgment. [ECF No. 90.] Then, on February 12, 2024, Plaintiff filed a supplemental memorandum in opposition to the ACDC Defendants' summary judgment motion. [ECF No. 100.] On February 20, 2024, the ACDC Defendants moved to strike Plaintiff's supplemental memorandum. [ECF No. 102.] Plaintiff next filed a document styled as both an opposition to the motion to strike and a motion for leave to file her supplemental memorandum. [ECF Nos. 103, 104.] The ACDC Defendants opposed the motion, and Plaintiff filed a reply. [ECF Nos. 106, 107.]

On April 26, 2024, Judge Marchant issued a Report and Recommendation ("Report"), in accordance with 28 U.S.C. § 636(b)(1)(b) and Local Civil Rule 73.02(B)(2) (D.S.C.), recommending that both the ACDC Defendants' motion for summary judgment and the SHP Defendants' motion to dismiss be granted.  [ECF No. 112.]  In the Report, the magistrate judge also denied Plaintiff's motion to supplement and granted the ACDC Defendants' motion to strike. *Id.*

Plaintiff objects but only to the recommended dismissal of Defendants Whitaker and Riddell.  [ECF No. 115.]  Through her objections, Plaintiff also appeals the magistrate judge's denial of her motion to file a supplemental response and the grant of the ACDC Defendants' motion to strike.  *Id.*

The ACDC Defendants filed a reply to Plaintiff's objections but raise no objections of their own.  [ECF No. 116.]

## BACKGROUND

The Report includes a very thorough summary of the facts of this case, and the court adopts those facts.  But because the medical records, in particular, set out a useful timeline for understanding the progression of Plaintiff's condition while at ACDC, the court outlines those records below.  *See* ECF No. 82.

## I.    Plaintiff's Medical Issues During May/June of 2019

### May 3

Plaintiff arrived at ACDC on Friday, May 3, 2019.  [ECF No. 1 at 3.]  A medical staff screening form was completed for Plaintiff.  [ECF No. 82 at 13.]  One question asked "[H]ave you fainted or had a head injury within the last 72 hours?"  *Id.*  "Yes" was circled, and "Wenesday [sic] overdosed" was written under that question.  *Id.*  The form also indicated that Plaintiff had a painful

dental condition—"teeth hurt." *Id.* "Heroin detox" was noted on the records, and a detox medication regimen was set and started. *Id.* at 3.

**May 4**

According to a withdrawal monitoring form, Plaintiff was seen by SHP personnel at 9 a.m., 4:30 p.m., and 10 p.m. on May 4, 2019. [ECF No. 82 at 14.] The form indicates Plaintiff had weakness and shakiness/muscle twitching/restlessness/anxiety/ataxia but no sweating at each visit that day. *Id.* Plaintiff's blood pressure, pulse and oxygen saturation, respiration, and temperature were also recorded.[1] *Id.* Plaintiff reported nausea but no vomiting or diarrhea. *Id.* No confusion or slurred speech was observed by medical personnel. *Id.*

**May 5**

Plaintiff was seen twice on this date, according to the withdrawal monitoring form. *Id.* Again, the form endorses symptoms of weakness and shakiness/muscle twitching/restlessness/ anxiety/ataxia and, once, sweating. *Id.* The medical staff's observations and Plaintiff's complaints were mostly the same as the day before, except Plaintiff no longer reported nausea. *Id.*

**May 6**

Plaintiff refused to be seen on May 6, 2019. *Id.*

**May 7**

Plaintiff initially refused to be seen on May 7, 2019. *Id.* But, at some point, she was seen, and the SHP records noted no weakness, sweating, shakiness/muscle twitching/restlessness/ anxiety/ataxia, nausea, vomiting, or diarrhea. *Id.* at 15. This date is also the first documentation

---

[1] These same readings were monitored and recorded at almost every withdrawal monitoring visit. *See* ECF No. 82 at 14–17. The withdrawal monitoring form states, "If readings are elevated and/or low <u>with</u> other abnormalities or elevated symptoms, Call Provider." *Id.* (emphasis in original).

of Plaintiff complaint of a "knot to [right] side of head[,]" for which she was prescribed ibuprofen for five days. *Id.*

**May 8**

On May 8, 2019, Plaintiff was seen at 9 a.m., 4 p.m., and 10:55 p.m. *Id.* at 15. She had weakness and shakiness/muscle twitching/restlessness/anxiety/ataxia but no sweating. *Id.* She also had no vomiting, nausea, diarrhea, confusion, or slurred speech. *Id.*

**May 9**

Plaintiff was observed twice on May 9, 2019, and her reports and medical personnel's observations about her symptoms were largely similar to the previous day's notes. *Id.*

**May 10**

Plaintiff was monitored twice on May 10, 2019, according to the withdrawal monitoring form. *Id.* at 15–16. Again, observations and reports were largely similar to the previous day, but, at 9 a.m., Plaintiff did not have shakiness/muscle twitching/restlessness/anxiety/ataxia. *Id.*

Separate records document that, at 4:15 p.m., there was an emergency call to Plaintiff's pod. *Id.* at 9. Plaintiff "was found laying on floor on her back alert & orient[ed]." *Id.* She started crying and said she had a headache and her nose was bleeding. *Id.* But the nurse who recorded the incident noted there was no blood on her tissue. *Id.* Plaintiff's blood pressure, heart rate, respiration, and temperature were checked and recorded. *Id.* Plaintiff asked for more ibuprofen and was told she would get some that evening. *Id.* Plaintiff was encouraged to drink more fluids "due to detox." *Id.*

**May 11**

Plaintiff was seen four times for withdrawal monitoring on May 11, 2019. *Id.* at 16. She had weakness at each visit, and once she had shakiness/muscle twitching/restlessness/

5

anxiety/ataxia. *Id.* But, otherwise, she had no sweating, nausea, diarrhea, vomiting, confusion, or slurred speech. *Id.* On that date, Plaintiff submitted an inmate grievance, stating "I HAVE A HUGE ABCESSS ON THE SIDE OF MY HEAD THAT KEEPSGETTING BIGGER AND HURTS REAL BAD I NEED MY TOOTH PULLED OR SOME ANTIBIOTICS." *Id.* at 18 (errors in original).

## May 12

Plaintiff was seen the next day for her abscess complaint. *Id.* at 19. She rated her pain a "10," and the records document several broken teeth. *Id.* at 19–20. But Plaintiff was also observed to be calm, oriented, alert, and cooperative. *Id.* SHP personnel noted "redness" and "decayed tooth." *Id.* Plaintiff was prescribed ten days of an antibiotic and seven days of ibuprofen. *Id.* at 20. She was also placed on the "dentist list." *Id.*

In addition, the withdrawal monitoring form indicates Plaintiff was seen three times on May 12, 2019, by medical staff. *Id.* at 16–17. Again, reports and observations were similar to that of the previous days with no shakiness/muscle twitching/restlessness/anxiety/ataxia, and Plaintiff only once had weakness, according to the notes. *Id.*

## May 13

Plaintiff was seen twice on May 13, 2019, by SHP staff on her final day of detox monitoring. *Id.* at 17. She had no weakness, sweating, or shakiness/muscle twitching/restlessness/ anxiety/ataxia. She also had no vomiting, nausea, diarrhea, confusion, or slurred speech. *Id.*

## May 16

On May 16, 2019, Plaintiff submitted a grievance where she complained of a fever and "really bad pain" in her ear. *Id.* at 21 (cleaned up). She was put on the sick call list by Nurse Donna. *Id.*

**May 19**

A handwritten note from May 19, 2019, on Plaintiff's May 16th grievance, indicates that Plaintiff was on amoxicillin and ibuprofen. *Id.*

**May 20**

On May 20, 2019, Plaintiff submitted a grievance stating as follows:

I HAVE A FKUID LIKE SACK ON SIDE OF MY HEAD, ABOVE MY EAR. MY EAR ACHES AND IM STILL FIGHTING A FEVERE AND SEVERE HED PRESSURE. MY EYES WATER CONSTANTLY AND I HAVE SEVERE NAUSEA N VOMITTING. I ALSO FEEL DIZZY AND CANT FOCUS MY EYES WHEN I STAND UP. THE WHOLE RIGHT SIDE OF MY FACE IS SWOLLEN AND VERY PAINFUL. I HAVE NOT BEEN ABLE TO GET OUT OF BED FOR 4 PLUS DAYS ON THE EXCEPTION OF SHOWERING. PLEASE HELP ME AND SEND MOTRIN.

*Id.* at 22 (errors in original). In response, Nurse Malinda indicated Plaintiff would be seen at the next available sick call. *Id.*

**May 21**

On May 21, Plaintiff submitted a grievance where she stated, "I HAVE FLUID UNDER MY SKIN ABOVE MY R EAR. BEEN THERE FOR 4 PLUS DAYS, WHOLE SIDE OF FACE IS SWOLLEN AND HAVE PLACED SEVERAL SICK CALLS AND HAVE NOT BEEN SEEN YET. I AM IN SEVERE PAIN AND PRESSURE IN MY HEAD." *Id.* at 23. Again, Nurse Malinda responded Plaintiff would be seen at the next available sick call. *Id.*

**May 22**

On May 22, 2019, Plaintiff was seen by a nurse for the knot on her head. *Id.* at 25. The notes from that visit indicated Plaintiff was on antibiotics, but the knot "now has a soft center." *Id.* at 26. Plaintiff asked to be seen by a doctor and asked for Tylenol. *Id.* She also requested to be seen by a mental health provider. *Id.* Plaintiff was advised to finish her antibiotics, and she was placed on the doctor's list. *Id.*

**May 23**

Dr. Williams saw Plaintiff for swelling to the right side of her scalp on May 23, 2019. *Id.* at 10. Dr. Williams noted a "small hematoma to [right] parietal scalp" and "tenderness." *Id.* He prescribed warm compresses and three days of Tylenol. *Id.* at 3, 10.

**May 24**

On May 24, 2019, Plaintiff submitted an inmate grievance with the subject "I HAVE NOT BEEN SEEN BY A DENTIST" where she indicated she had been taken off all pain meds but had not seen a difference. *Id.* at 24. According to jail records, around 5:40 p.m., Plaintiff refused to return to her cell. [ECF No. 84-14.] She was escorted there by correctional officers, including Defendant Riddell. *Id.* at 2, 6

**May 28**

On May 28, 2019, medical staff responded to an emergency call after Plaintiff fainted. [ECF No. 82 at 11.] Plaintiff complained of swelling to the right side of her face. *Id.* She was responsive, able to answer questions appropriately, and had no slurred speech. *Id.* Plaintiff was assisted to her bunk by Defendant Whitaker and another officer. *Id.* Dr. Williams was notified, and he ordered a CT scan to rule out a contusion to the brain. *Id.* at 4, 11. SHP records from that day otherwise indicate Plaintiff was seen for a toothache and given ibuprofen. *Id.* at 3, 27–28.

**May 29**

Plaintiff requested and was given Tylenol for pain on the right side of her head. *Id.* at 11.

**May 31**

On May 31, 2019, Plaintiff was seen for increased pain from the protrusion on the right side of her temple. *Id.* at 29. She was assessed as oriented, alert, and cooperative and had

respiration that was even and unlabored. *Id.* Her pupils were equal, round and reactive to light and accommodation. *Id.* Plaintiff was prescribed Tylenol for five days. *Id.*

**June 2**

At 3:30 p.m., medical staff were called to Plaintiff's pod because she passed out. *Id.* at 11. She was found lying on the ground. *Id.* After medical personnel rubbed her back and called her name, Plaintiff sat up and answered questions appropriately. *Id.* Plaintiff indicated "she did not know what happened, she just felt 'weird.'" *Id.* Plaintiff and the pod officer were told Plaintiff had to have "a buddy in place when she was getting up, she can't get up alone." *Id.*

At 6:30 p.m. that same day, medical personnel were again called to Plaintiff's cell. *Id.* at 12. Plaintiff was vomiting and continued to complain that she felt "weird." *Id.* Her temperature was elevated. She said she felt dizzy and "like 'needles poking in her head.'" *Id.* Plaintiff was pale and had a "large pea size lump in her neck, below jawline." *Id.* At that time, medical staff told ACDC officers that Plaintiff had to go to the hospital, and she was taken there that day. *Id.*

## II.    What Defendants Riddell and Whitaker Knew

As the court addresses Plaintiff's objection to the recommended dismissal of Defendants Riddell and Whitaker, it is also useful to review the evidence regarding what both Defendant Riddell and Defendant Whitaker knew about Plaintiff's condition based on their interactions with Plaintiff and what they were told by other correctional officers at ACDC.

Deputy Kelley testified she raised issues regarding Plaintiff with Defendants Riddell and Whitaker:

> Q.    What kind of issues did you raise up the chain of command?
>
> A.    Complaints that I felt like they weren't doing what they should have been doing to assist an inmate. Obviously with Cassi Rhoads, I brought that issue up to Lieutenant Riddell, I brought that issue up to Lieutenant Whitaker,

and their response was, "We cannot overstep Medical.  If Medical doesn't
want to send her out, we can't force them to do so."

[ECF No. 84-4 at 16–17; *see also id.* at 22 (stating that, after raising her concerns with medical

staff and helping Plaintiff submit medical requests, she "began voicing her concerns to [her]

supervisory team and even offered to take [Plaintiff] to Aiken Regional Medical Center . . . but

was told that Cassie didn't need to be seen at a hospital").]  Kelley also testified that she spoke

directly to medical staff regarding her concerns about Plaintiff, and she recalled she "actually got

backlash from [her] supervisor [Riddell] because [she] had gone directly to Medical instead of

allowing the inmate to submit medical requests through the kiosk like we were supposed to."  *Id.*

at 18.

Deputy Carla Hill testified that, "close to the time [Plaintiff] was sent out[,]" Hill observed

Plaintiff to have a swollen area the size of a grapefruit on her head.  [ECF No. 84-8 at 3–4.]  Hill

became further concerned because "Medical was saying that she was self-inflicting, and I had

never seen her bang her head or hit her head on the floor or the wall."  *Id.* at 3; *see also id.* at 6

(testifying Nurse Donna told her Plaintiff was self-inflicting).  Hill told Nurse Donna as much, *id.*

at 9, but she also she asked Deputy Lisa Bauer to check on Plaintiff to see if she thought Plaintiff's

abscess was self-inflicted.  *Id.* at 3.  That same day, Hill reported to Defendant Whitaker her

concerns "about how much swelling there was" and that Nurse Donna said it was self-inflicted.

*Id.* at 11–12 ("[D]id you report to Whitaker that Nurse Donna was telling you it was self-inflicted?"

A: "Yes, sir.").  According to Hill, "Lieutenant Whitaker stated that she would talk to medical to

find out what was going on."  *Id.* at 11.  But Whitaker also reportedly asked Hill if she was sure

she had kept a close watch on Plaintiff, and Hill responded that she was.  *Id.* at 12.  Hill believed

this all took place either May 28 or the day before.  *Id.* at 12.

In her own deposition, Bauer confirmed that Hill asked her to take a look at Plaintiff, and she, too, observed Plaintiff to have a swollen head. [ECF No. 84-6 at 5.] Bauer reported what she had seen to Defendant Whitaker. [ECF No. 84-6 at 6–7 ("I did notify Lieutenant Whitaker and tell her that I had seen the swelling on the side of her head.").]

Defendant Riddell testified that he could not recall anyone bringing to his attention that Plaintiff had an abscess. [ECF No. 84-10 at 3.]

Defendant Whitaker did not recall asking any correctional officers to monitor Plaintiff for any swelling or other medical matter. [ECF No. 84-13 at 3.] Defendant Whitaker also did not have any independent recollection of Bauer coming to her about Plaintiff's head. *Id.* at 4–5. And she did not have any recollection of Kelley raising concerns about Plaintiff to her. *Id.* at 6.

## LEGAL STANDARDS

### I.    Review of a Report and Recommendation

The magistrate judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). In response to a recommendation, any party may serve and file written objections. *See Elijah v. Dunbar*, 66 F.4th 454, 459 (4th Cir. 2023) (citing 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(3)). The district court then makes a de novo determination of those portions of the Report to which an objection is made. *Id.* To trigger de novo review, an objecting party must object with sufficient specificity to reasonably alert the district court of the true ground for the objection. *Id.* (quoting *United States v. Midgette*, 478 F.3d 616, 622 (4th Cir. 2007)). If a litigant objects only generally, the court need not explain adopting the Report and must "only satisfy itself that there is no clear error on the face of the record

in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (citing Fed. R. Civ. P. 72 advisory committee's note).

An objection is specific so long as it alerts the district court that the litigant believes the magistrate judge erred in recommending dismissal of that claim. *Elijah*, 66 F.4th at 460. Objections need not be novel to be sufficiently specific. *Id.* Thus, "[i]n the absence of specific objections . . . this court is not required to give any explanation for adopting the recommendation." *Field v. McMaster*, 663 F. Supp. 2d 449, 451–52 (4th Cir. 2009) (emphasis in original).

## II.    Summary Judgment

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of proving to the court that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

**DISCUSSION**

When Plaintiff filed this case in May 2022, the complaint included claims against both the ACDC Defendants and the SHP Defendants.  [ECF No. 1.]  But the scope of this case has since significantly narrowed, and Plaintiff is now only pursuing her § 1983 claims against Defendants Erik Riddell and Jessica Whitaker.  Based on her own objections, Plaintiff does not object to the dismissal of Defendants Buchanan, Buggs, or Erickson.  [ECF No. 115 at 1 n.1.]  And the ACDC Defendants do not object to the dismissal of the SHP Defendants.  Thus, as an initial matter, the court adopts the magistrate judge's recommendation that the ACDC Defendants' motion for summary judgment, ECF No. 81, be granted as to Defendants Buchanan, Buggs, and Erickson and that the SHP Defendants' motion to dismiss, ECF No. 83, be granted as to all claims against them.

What remains is the deliberate indifference claims—specifically, that Defendants Riddell and Whitaker knew, through other correctional officers, "that Plaintiff was seriously ill and had an obvious need for medical treatment beyond what the medical staff at the jail was providing[,]" but "Defendants Riddell and Whitaker did absolutely nothing."  [ECF No. 115 at 4.]

The Report recommends summary judgment on these claims because "there is no evidence that the ACDC Defendants failed to respond reasonably in light of Plaintiff's need for medical care, assuming it was obvious to them."  [ECF No. 112 at 25.]  Additionally, the Report reasons that the ACDC Defendants are entitled to qualified immunity.  *Id.* at 35–36.  Plaintiff objects to both of these conclusions.  *See* ECF No. 115.  For the reasons that follow, the court overrules Plaintiff's objections and adopts the Report.

## I.    Deliberate Indifference Standard

The Report outlines the law applicable to Plaintiff's deliberate indifference claims, and the court adopts the same without a full recitation.  *See* ECF No. 112 at 18–20.  To summarize, as a

pretrial detainee, Plaintiff's deliberate indifference claims are properly brought under the Due Process Clause of the Fourteenth Amendment, which protects the rights of pretrial detainees to receive adequate medical care. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) ("[T]he Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, 'mandates the provision of medical care to [pretrial] *detainees* who require it.'" (emphasis in original) (quoting *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992))). The Fourth Circuit recently established the following objective test for the determination of deliberate indifference claims:

> To state a claim for deliberate indifference to a medical need, . . . a pretrial detainee must plead that
>
> (1)    they had a medical condition or injury that posed a substantial risk of serious harm;
>
> (2)    the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed;
>
> (3)    the defendant knew or should have known
>
>> (a)    that the detainee had that condition and
>>
>> (b)    that the defendant's action or inaction posed unjustifiably high risk of harm; and
>
> (4)    as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023) (spacing added).

Prior to the Fourth Circuit's opinion in *Short*,[2] there was a subjective test for deliberate indifference in this Circuit. *See id.* at 603–11 (concluding that the Supreme Court's decision in

_____

[2] *Short* was issued after the ACDC Defendants' motion for summary judgment was fully briefed, but the magistrate judge concluded, and the court agrees, that the objective standard adopted in *Short* does not impact the arguments submitted by the parties in this case. [ECF No. 112 at 20 n.7.] Plaintiff asserts the Report "incorrectly concludes that 'the objective standard adopted in Short does not impact the arguments submitted by the parties in this case.'" [ECF No. 115 at 5.] But since Plaintiff does not ask to rebrief the motion, it appears she objects to the conclusion reached by the magistrate judge, not his decision to resolve the motion based on the briefs as-filed. In any event, the court finds that with the Report, Plaintiff's objections, and the ACDC Defendants'

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015) abrogated Fourth Circuit's precedent regarding test for pretrial detainee deliberate indifference claims). The subjective component of the prior test required "a pretrial detainee . . . [to] show that the defendant 'knew of and disregarded [a] substantial risk to the inmate's health or safety.'" *Id.* at 609 (quoting *Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023)). But under either the previous standard or the current standard, "it is . . . not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee. Negligence was not enough before, and it is not enough now." *Id.* at 611–12 (internal citations omitted).

## II. There is No Genuine Issue of Material Fact as to Deliberate Indifference

### A. The First and Second *Short* Factors

The Report concludes that summary judgment should be granted as to all of the ACDC Defendants because, assuming that Plaintiff sufficiently demonstrated a serious medical need that was obvious to the ACDC Defendants (the first *Short* factor), "there is no evidence that the ACDC Defendants failed to respond reasonably in light of Plaintiff's need for medical care . . . ." [ECF No. 112 at 24.] Thus, the Report concludes that there is insufficient evidence to meet the second factor under the *Short* test. *Id.* Central to that conclusion is binding precedent that "a nonmedical prison official can generally defer to the decisions of prison medical personnel at the institutional level. . . ." *Gordon v. Schilling*, 937 F.3d 348, 358 (4th Cir. 2019). And the Report cites ample case law on that point. [ECF No. 112 at 25–34.]

In her objections, Plaintiff asserts the Report overlooks evidence demonstrating a genuine issue of material fact as to the second *Short* factor. [ECF No. 115 at 5–16.] In particular, Plaintiff

---

response, which all use the now-applicable standard, the court has ample argument to decide these motions.

argues that the Report did not adequately consider the evidence from Deputy Carla Hill that Nurse Donna stated Plaintiff was self-harming and that Hill told Whitaker that information. *Id.* at 8–11. Nor did the Report discuss testimony from Hill, Deputy Lisa Bauer, or Deputy Kimberly Kelley that they expressed concerns about Plaintiff's deteriorating condition to Defendants Riddell and Whitaker with no action in response. *Id.*

The court agrees that, generally, the Report considered the conduct of the ACDC Defendants together rather than breaking out the conduct of Defendants Riddell and Whitaker separately. But, even though the Report looked at the actions of the Defendants broadly, that does not render the Report's reasoning incorrect now that Plaintiff has considerably narrowed her claims. Indeed, this court still agrees with the magistrate judge's conclusion that Plaintiff has failed to demonstrate a genuine issue of material fact as to the second *Short* factor.

Under the second *Short* factor, Plaintiff must present evidence that Defendants Riddell and Whitaker "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that [Plaintiff's] condition posed . . . ." 87 F.4th at 611. Plaintiff points to evidence that Defendants Riddell and Whitaker were told of Plaintiff's deteriorating condition, but Defendants Riddell and Whitaker did nothing in response. She also points to the fact that her swollen abscess was large and plainly visible. She insists that action—namely, speaking with medical staff about the cause of Plaintiff's abscess or overriding the medical staff's judgment and arranging for Plaintiff to be taken to the hospital—was required by Defendants Riddell and Whitaker to appropriately address the risk Plaintiff's condition posed.

Of course, on summary judgment, the court must take as true the evidence presented by Plaintiff. That evidence shows that Plaintiff had a swollen protrusion, roughly the circumference of a grapefruit, on her scalp when she was admitted to the hospital in June 2019. *See* ECF No. 84

16

at 25. Additionally, the evidence shows Hill, Bauer, and Kelley informed Defendants Riddell and Whitaker of Plaintiff's condition. Further, Whitaker was told by Hill that Nurse Donna said Plaintiff's injury was self-inflicted. But the evidence also shows that Plaintiff was being regularly treated by medical staff while at ACDC. With all of that evidence, the court cannot say that Defendants' inaction was inappropriate to address the risk Plaintiff's condition posed. As cited throughout the Report, there is ample case law that non-medical officers can defer to medical staff who are treating a pretrial detainee. *See, e.g.*, *McNeal v. Hutchinson*, No. 2:21-cr-3431-JFA-MGB, 2022 WL 17418060, at *10 (D.S.C. Sept. 19, 2022) ("As non-medical personnel, these Defendants were entitled to rely on the medical staff's expertise, diagnosis, and treatment plan."), *Report and Recommendation adopted by* 2022 WL 16631042 (D.S.C. Nov. 2, 2022), *aff'd* No. 22-7319, 2024 WL 1366553 (4th Cir. Apr. 1, 2024); *Annarelli v. Clarke*, No. 7:20-cv-00261, 2022 WL 4798345, at *14 (W.D. Va. Sept. 20, 2022) ("It was not [the non-medical defendants' role] to determine that something additional should have been done by a physician or that more treatment was warranted"), *aff'd* No. 22-7135, 2023 WL 5348337 (4th Cir. Aug. 21, 2023).

Plaintiff stresses that Defendants must be held accountable for their own actions. Further, she admits she "was seen by healthcare professionals on several occasions" but "submits she received no real treatment from the jails' medical staff." [ECF No. 115 at 12 n.11.] Plaintiff attempts to draw a comparison between her case and *Iko v. Shreve*, 535 F.3d 225 (4th Cir. 2008), where the Fourth Circuit found prison officials could not rely on the presence of medical staff to avoid liability themselves. In *Iko*, a prisoner died from asphyxiation "after being forcibly removed from his cell and transferred to another cell by a team of seven correctional officers[.]" *Id.* at 230– 33. The officers "were all aware that Iko had been doused in pepper spray . . . and had seen its effects first-hand when they entered the cell, with their gas masks on, to shackle Iko." *Id.* at 242.

Iko was then taken to a nearby medical room to be examined by a nurse, who told Iko she was there to offer treatment. *Id.* at 232. Iko did not respond, and the nurse commented that he did not appear to be reacting to the pepper spray. *Id.* Then, "officers witnessed Iko collapse forward . . ., caught him, and directed him to a wheelchair." *Id.* at 242. The Fourth Circuit found, "This case does not . . . present a situation in which prison officials might be held liable for the actions or inactions of a medical professional. The officers face liability for their own decisions, made while Iko was in their charge." *Id.* Additionally, the Court further distinguished Iko "because it [was] undisputed that Iko received no medical treatment whatsoever. There was *no* medical opinion to which the officers could have deferred." *Id.* (emphasis in original).

The court finds *Iko* and the instant case readily distinguishable. No one declined to treat Plaintiff. Here, Plaintiff was actively being treated for her condition by medical staff at ACDC. She was seen by medical personnel relatively soon after submitting grievances, was diagnosed with a hematoma with some infection, was prescribed antibiotics and pain relievers, was directed to use warm compresses, and had a head CT scheduled. Defendants Riddell and Whitaker cannot avoid consequences for their own actions, but, here, their actions were informed, in part, by the knowledge that Plaintiff was under the care of medical providers at ACDC. And Defendants Riddell and Whitaker, who were not medical staff, appropriately deferred to the treatment plan by medical personnel. *See Pickens v. Lewis*, 1:15-cv-275-FDW, 2018 WL 2187051, at *10 (W.D.N.C. May 11, 2018) ("[P]rison officers 'without medical training are responsible for seeing that prisoners are attended to by medical professionals. They are not responsible for determining the course of treatment or for overruling the opinions of those professionals.'" (quoting *Pulliam v. Superintendent of Hoke Corr. Inst.*, 1:05CV1000, 2007 WL 4180743, at *5 (M.D.N.C. Nov. 20, 2007))). As noted throughout the Report, that is consistent with the law.

18

For the reasons outlined above and in the Report, the court finds Plaintiff has failed to demonstrate a genuine issue of material fact as to the second *Short* factor.

### B.    The Third *Short* Factor

Plaintiff seems to take issue with the fact that the Report did not address the third and fourth *Short* factors.  Of course, if Plaintiff failed as to one factor, there was no need to address the other factors.  However, the court finds Plaintiff fares no better as to the third and fourth factors.

As to the third *Short* factor, there is certainly evidence that Defendants Riddell and Whitaker knew of Plaintiff's condition.  But there is *not* evidence from which the court can find that they "knew or should have known . . . that [their] action or inaction posed an unjustifiably high risk of harm . . . ."  *Short*, 87 F.4th at 611.  To some extent, this analysis dovetails with the above analysis on the second *Short* factor.  Defendant's knowledge that Plaintiff's abscess continued to grow and cause problems, and even the knowledge that the medical staff might have wrongly attributed the abscess to self-harm, when considered in conjunction with the fact that Plaintiff was being treated by medical professionals for her condition, does not satisfy this factor. Again, Defendants Riddell and Whitaker could defer to the treatment by the medical staff at ACDC.

The court cannot find that Defendants Riddell and Whitaker knew or should have known that their action or inaction posed an unjustifiably high risk of harm.  Plaintiff's evidence fails as to the third *Short* factor.

### C.    The Fourth *Short* Factor

The final factor concerns harm.  Clearly, Plaintiff suffered harm from her abscess. However, did that harm *result* from Defendant Riddell and Whitaker's inaction?  Here, too, Plaintiff's evidence is lacking.

There is evidence that Nurse Donna told Hill Plaintiff was self-harming. But, contrary to Plaintiff's position, there is no evidence to suggest that the medical providers' treatment of Plaintiff's abscess was *based on* the belief that she was self-harming. Additionally, there is no evidence from which the court could conclude that, had Defendants Riddell and Whitaker told the medical providers that Plaintiff's abscess was not self-inflicted, the medical staff would have adjusted Plaintiff's treatment.

As to Plaintiff's claim that Defendants Riddell and Whitaker should have overridden the treatment plans of the medical staff and sent Plaintiff to a hospital, Plaintiff does not specify when that was appropriate. But, even assuming Plaintiff believes they should have done so as soon as Defendant Whitaker heard from Hill, that would have been, at the earliest, May 27th—six days before Plaintiff was taken to the hospital. Plaintiff has not identified any evidence from which the court could conclude that Plaintiff was harmed by that six-day delay. But, even if the court drew an inference in Plaintiff's favor from the evidence, Plaintiff's claims against Defendants Riddell and Whitaker would not survive summary judgment based on the deficiencies outlined above with respect to the second and third *Short* factors.

## III.    Defendants are Entitled to Qualified Immunity

The Report recommends finding that the ACDC Defendants are entitled to qualified immunity. [ECF No. 112 at 35–36.] Plaintiff objects. [ECF No. 115 at 17.]

Whether Defendants are entitled to qualified immunity requires the court to conduct a two-step inquiry. *See Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). The court must ask "'whether a constitutional right would have been violated on the facts alleged' by the plaintiff." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). The court must also ask whether the right allegedly violated "was clearly established at the time of the alleged violation." *Id.* (citing *Saucier*,

533 U.S. at 200). And these questions can be asked in any order the court wishes. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "[W]hile the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" *Willingham*, 412 F.3d at 559 (quoting *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992)).

In her objections, Plaintiff offers that she has sufficiently shown that Defendants Riddell and Whitaker violated her Fourteenth Amendment rights, and, thus, they are not entitled to qualified immunity. [ECF No. 115 at 17.] Indeed, under Fourth Circuit precedent for deliberate indifference claims, the violation of a constitutional right and the denial of qualified immunity usually go hand-in-hand. 87 F.4th at 615 (explaining that "under [Fourth Circuit] precedent, qualified immunity is generally not available at all for deliberate indifference claims" since the Fourth Circuit has held "'when plaintiffs have made a showing sufficient to demonstrate an intentional violation of the Eighth Amendment, they have also made a showing sufficient to overcome any claim to qualified immunity'" (quoting *Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022))). However, as already discussed above, here, Plaintiff has not demonstrated a genuine issue of material fact as to whether Defendants Riddell and Whitaker were deliberately indifferent. Consequently, they are entitled to qualified immunity.

In their response to Plaintiff's objections, the ACDC Defendants also point out that, at the time of Defendants' conduct, the *Short* test for deliberate indifference did not exist. And the qualified immunity analysis "requires looking to the law *at the time* of the conduct in question." *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (emphasis in original). In 2019, "[a]n official [was] deliberately indifferent to an inmate's serious medical needs only when he or she

subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).  Other courts in this Circuit have found that, for activity that pre-dates *Short*, officials are entitled to qualified immunity absent an adequate showing on the subjective prong of the prior test—"[b]ecause . . . plaintiff fails to show any individual defendant acted with a culpable state of mind, reasonable officers in defendants' positions would not have recognized that their actions violated plaintiff's clearly established constitutional rights." *Wright v. Granville Cnty.*, No. 5:20-CT-03362-M, 2024 WL 1376486 at *21 (E.D.N.C. Mar. 29, 2024); *see also Patterson v. Stanly Cnty. Det. Ctr.*, 2024 WL 1936499 at *10–11 (M.D.N.C. May 2, 2024) (find that to preclude qualified immunity pre-*Short* it was not enough that a defendant "*should have* recognized their actions were inappropriate; they actually *must have* recognized their actions were insufficient" and their response "must be more than merely negligent or simply unreasonable").  The court finds persuasive that reasoning and concludes, when looking at the facts of this case in the light most favorable to Plaintiff, the absence of evidence on the subjective prong of the pre-*Short* deliberate indifference test entitles Defendants Riddell and Whitaker to a qualified immunity, as well.

## IV.     Denial of the Motion to Strike and Motion to Supplement

As referenced above, the magistrate judge denied Plaintiff's motion to supplement the record with additional documents and testimony.  Plaintiff now appeals that decision.  [ECF No. 115 at 17–23.]

Rule 72(a) of the Federal Rules of Civil Procedure permits a party to submit objections to a magistrate judge's ruling on non-dispositive matters.  Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A).  The objections must be filed and served "within 14 days after being served a copy" of the non-dispositive order.  Fed. R. Civ. P. 72(a).  Further, the court's review is governed by the

"clearly erroneous" or "contrary to law" standard of review. *Id.* Only if the decision is "clearly erroneous or contrary to law" may the district judge modify or set aside any portion of the decision. *Id.* A court's "finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948).

Here, Plaintiff submitted a supplemental memorandum with a copy of the ACDC Inmate Rules and Regulations, deposition testimony by Captain Gallam, trial testimony[3] by Gallam, Hill, and Kelley, an ACDC supervisor review by Defendant Whitaker, and an ACDC progress note regarding Plaintiff dated May 28, 2019. [ECF Nos. 100-1 through 100-8.] According to Plaintiff's memorandum, some of the supplemental material goes to the issue of exhaustion and some of it to her arguments on deliberate indifference and qualified immunity. [ECF No. 100.] As to the deliberate indifference material, the new evidence generally shows that Defendants Riddell and Whitaker had the authority to "overstep medical" and, based on Gallam's testimony, that was even the expectation for "something externally that's blatantly obvious." *Id.* at 14; *see also* ECF No. 100-1 at 4. The trial testimony from Kelley and Hill is essentially the same as their deposition testimony. *Cf.* ECF Nos. 84-4; 84-8; 100-5; 100-6.

Plaintiff argues that the magistrate judge seemingly only denied the motion to supplement because the information was directed to the issue of exhaustion, an issue the magistrate judge resolved in Plaintiff's favor. [ECF No. 115 at 18.] But Plaintiff contends the evidence also was directed to the issues of deliberate indifference and qualified immunity. Notably, it appears it was Plaintiff's own motion that directed the magistrate judge's analysis. Indeed, Plaintiff's motion for

---

[3] Plaintiff filed a state court action against ACDC and won a judgment against it in October 2023. None of the Defendants named in this action were defendants in that case. The testimony Plaintiff submitted to supplement the record is from that state court trial.

leave to file the supplement, ECF No. 103, *only* argued that the supplemental evidence should be allowed to address the ACDC Defendants' exhaustion argument. And Plaintiff even told the court,

> [T]he Supplemental Memorandum (ECF No. 100) is not a surreply, as it does not address arguments raised in Defendants' Reply . . . but seeks merely to provide the Court one newly discovered document (which Defendants should have produced long ago) and newly acquired testimony that contradicts the Defense's PLRA Exhaustion argument. Plaintiff's filing does not present or address new arguments but supplements the record pertaining to the PLRA Exhaustion argument with factual information that was first made available to her after Plaintiff's Response in Opposition . . . was filed on September 14, 2023.

[ECF No. 103 at 3.] So, in her own motion, Plaintiff only asked to supplement to address exhaustion. In light of Plaintiff's arguments, the court finds the magistrate judge's disposition of the motion was neither clearly erroneous nor contrary to law. Plaintiff's appeal of the magistrate judge's order is denied.[4]

## CONCLUSION

Plaintiff initially filed this action against both correctional officers and medical staff at ACDC. But she has since settled with the medical defendants and abandoned her claims against some of the correctional officers, leaving this court to decide only whether the remaining defendants' inaction amounts to a constitutional violation. Based on the evidence before the court, correctional officers who worked for Defendants Riddell and Whitaker came to them disturbed by Plaintiff's deteriorating medical condition. And while there is a gap in the evidence as to whether Defendants Riddell and Whitaker raised the concerns to the medical staff at ACDC, ultimately, it is clear they did not override the judgment of the medical staff and have Plaintiff taken to the hospital. At the same time, the court is mindful that Plaintiff was under the care of nurses and a

---

[4] Further, having fully reviewed Plaintiff's supplemental evidence, the court notes that the consideration of this evidence would not change this court's findings as to either deliberate indifference or qualified immunity.

doctor for her condition, and Defendants Riddell and Whitaker knew that. There is no evidence that either Defendants Riddell and Whitaker or the correctional officers who raised complaints were medically trained. As such, they were in a poor position to second guess medical personnel who were actively treating Plaintiff. Having reviewed the evidence—including imaging of Plaintiff's head once she arrived at the hospital—and having applied the standard articulated in *Short*, along with the standard for qualified immunity prior to *Short*, the court is constrained to find that Defendants Riddell and Whitaker were not deliberately indifferent under the law and cannot be held liable for their inaction under § 1983. *See King v. United States*, 536 F. App'x 358, 361 (4th Cir. 2013) ("To constitute deliberate indifference to a serious medical need, 'the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" (quoting *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990))).

After a thorough review of the Report, the applicable law, and the record in this case in accordance with applicable standards of law, the court **ADOPTS** the Report and Recommendation, ECF No. 112. Accordingly, the ACDC Defendants' motion for summary judgment, ECF No. 81, is **GRANTED**, and the SHP Defendants' motion to dismiss, ECF No. 83, is also **GRANTED**. Summary judgment is granted as to Defendants Chanate Buchanan, Tonetta Buggs, Tamara Erikson, Erik Riddell, and Jessica Whitaker. Defendants Southern Health Partners, Inc., Dr. Robert J. Williams, Brandi Galloway, and Donna Wright are dismissed with prejudice.

**IT IS SO ORDERED.**

*Sherri A. Lydon*

August 20, 2024                                        Sherri A. Lydon
Columbia, South Carolina                    United States District Judge